UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
CHAD S. JOHNSON,

                      Plaintiff,

  -against-

SUFFOLK COUNTY, SCPD
HEADQUATERS, SEAN COMISKEY,
MICHAEL SOTO, and SEAN P.
MCQUAID,

                      Defendants.
-------------------------------------------------------------X

**MEMORANDUM AND ORDER**
11-CV-2481(SIL)

**STEVEN I. LOCKE, United States Magistrate Judge:**

Presently before the Court in this excessive force action brought pursuant to 42 U.S.C. § 1983 ("Section 1983") is Plaintiff Chad Johnson's ("Plaintiff" or "Johnson") motion for a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.") after a jury verdict in favor of Defendants Sean Comiskey ("Comiskey"), Michael Soto ("Soto") and Sean P. McQuaid ("McQuaid").[1] *See* DE [167], [168], [169]. Specifically, Johnson argues that certain evidence was admitted at trial in contravention of earlier rulings on the parties' motions *in limine* that was unduly prejudicial, thereby tainting the verdict. For the reasons set forth below, the motion is denied.

**I.    BACKGROUND**

    **A.    Trial Testimony**

---

[1] Defendants Suffolk County and SCPD Headquarters were dismissed from this case prior to trial. *See* DE [5], [18].

1

The following facts are drawn from the testimony at trial.[2] On the date of the alleged use of excessive force, May 24, 2010, Plaintiff was 22 years old, 5' 11" and weighing approximately 145 to 150 pounds. Tr. 59. He worked as a stock boy on the overnight shift at a local Stop & Shop and was a student at Briarcliff College. Tr. 60-61. At the time he lived with his then girlfriend-now wife Paulette Plant, her sister, her sister's partner and their child. Tr. 61, 120.

On April 6, 2010, Plaintiff was visited by two detectives from the Suffolk County Police Department, Thomas McDougal and Mark Pulaski, in connection with a murder. Tr. 120, 380-81, 518.[3] The conversation was friendly and Johnson was not arrested. Tr. 121. Johnson concedes that he was dishonest with the detectives during this conversation. Tr. 229-30.

Plaintiff's first interaction with Defendants Detectives Soto and Comiskey was on April 9, 2010. Tr. 119, 122, 489, 517-18. Soto and Comiskey came to Johnson's house, sometime between 11:00 a.m. and noon, Tr. 124-25, 129, 381-82, and the three of them wound up talking in the unmarked police car the detectives arrived in, with Soto and Comiskey in front and Plaintiff in the back seat. Tr. 125-26, 384, 489, 519-20. The initial conversation ended so that Plaintiff could have lunch with Ms. Plant and then the three of them met again afterwards at approximately 1:30 p.m. at a deli across from where his wife worked. Tr. 130-32; *see* Tr. 385-86, 520-21. The conversation then continued in the unmarked car, again with the detectives in front

---

[2] References to the trial transcript are citations to "Tr." *See* DE [167-3], [167-4], [167-5].
[3] Plaintiff was ultimately convicted of the murder, but the jury was not told the nature of the underlying crime or the substance of Johnson's confession. *See* DE [167-3], [167-4], [167-5].

and Johnson in the back seat. Tr. 133, 387, 490. At this point the conversation turned to the case the detectives were investigating. Tr. 135. During this interaction the three of them took a ride with Plaintiff directing the detectives to various locations in Bay Shore that Johnson thought would be relevant to the case under investigation. Tr. 145-46, 152-53, 159, 402-03, 490, 524-25. The conversation that day was not adversarial or aggressive. Tr. 154

During this conversation one of the detectives took notes and Plaintiff was given a written statement and documentation of the directions he had given. Tr. 135-36, 526-27. On the one hand Johnson testified that he did not sign the statement or the directions that day, and the detectives left, although he admits that he did initial and sign the directions at some point. Tr. 136-37, 159-60. On the other, Defendants testified that he did sign the statement on that day, the statement is signed by Johnson on each page, and there are multiple places where Plaintiff initialed his (Johnson's) edits. *See* Tr. 391-401, 411 & Exhibit ("Ex.") PP. In addition to this written statement, Defendants wrote a second statement consisting of the directions that Johnson gave Soto and Comiskey to visit various locations related to their investigation. Tr. 406-07 & Ex. QQ. Johnson signed the directions as an acknowledgment of their accuracy after making two corrections, which he initialed. Tr. 403, 410 & Ex. QQ. At no time during this interaction did Plaintiff have a problem with Defendants and he did not ask for a lawyer. Tr. 195-96. Nor was Johnson under arrest at this time. Tr. 523 (Plaintiff was free to go).

The next time Johnson saw Detectives Soto and Comiskey, or anyone from the Suffolk County Police Department, was May 24, 2010.  *See* Tr. 164-65, 416-17, 490, 530.  On that day, while driving his younger brother's car to drop his wife and brother off at work, Plaintiff was pulled over by Defendant McQuaid.  Tr. 61-62, 178-79, 324, 533.  McQuaid asked Johnson for his license and registration, which Plaintiff did not have, so he provided his New York State identification.  Tr. 62, 179, 324; *see* Tr. 418-19.  McQuaid went back to his car, and then upon his return, directed Johnson to step out of the car, which he did, and McQuaid arrested and handcuffed him.  Tr. 62, 179-80, 324-25.  McQuaid then put Plaintiff in McQuaid's car, while he searched Johnson's vehicle.  Tr. 63, 180; *see* Tr. 325.  Upon McQuaid's return he told Johnson that Detective Soto wanted to speak with him.  Tr. 63.

The two traveled to police headquarters in Yaphank, where Plaintiff was brought in through the loading dock behind police headquarters.  Tr. 64, 182, 184-85, 326-27.  After entering, Johnson saw Soto, whom he recognized from the prior interaction.  Tr. 64-65; *see* Tr. 330.  Plaintiff was then taken to an interview room where he was given a chair and handcuffed to a chain connected to the floor.  Tr. 65-66, 189-90, 201, 329, 332-34, 491, 541-42.  McQuaid then left the room and Defendants Soto and Comiskey entered.  Tr. 66-67, 335.

According to Johnson, he asked to speak with a lawyer and Defendants refused. Tr. 67. And when he was asked to sign a Miranda form, advising him of his rights to remain silent and to have an attorney, he declined, asked to speak with a lawyer again, and in response Soto punched him in the face.  Tr. 70; *see* Tr. 194-97.

4

Plaintiff eventually signed the Miranda card when he was forced to. Tr. 197. In any event, after being punched, Johnson fell to the floor, still cuffed, and tried to curl into a fetal position, while Soto kicked him screaming racial slurs and obscenities. Tr. 70-71, 197-98, 202-03. The assault took a couple of seconds and Comiskey stood by the door while it happened, until Comiskey pulled Soto away. Tr. 71. Both detectives then left the room. Tr. 71-72.

Defendants told a different story. According to Detective Soto, Johnson signed the Miranda card and agreed to speak with him. Tr. 426-28, 539 & Ex. F. The detectives did not leave the room until after they raised certain inconsistencies in Johnson's prior statements after which Plaintiff became "less talkative." Tr. 430-31. It was during this break that McQuaid, along with another detective, brought Johnson's brother Dartanion Johnson into the precinct. Tr. 433-34; *see* Tr. 495. Dartanion provided information that was relevant to the investigation, and Soto subsequently spoke with him. Tr. 440-41.

Fifteen minutes later the detectives returned to the room where Johnson was being held with a third unidentified officer who had a camera and a white jumpsuit. Tr. 72. According to Johnson, Comiskey then told Plaintiff that his clothes had to be collected as evidence and that he should change into the jumpsuit, which he did. Tr. 72. According to Soto, Plaintiff was given the jumpsuit because he was cold. Tr. 484. The third officer then told Johnson that he needed to take pictures of Plaintiff, which he did. Tr. 72-73, 209-11 (the photos were taken after the first assault), 482 & Exs. J1-J16. In this regard, the Court notes that, although Plaintiff claims that the photos

5

show redness where he was hit, *see* Tr. 76-77, the photos, including a close-up head shot, and a picture of Johnson in his boxer shorts, show no physical injury, either to Plaintiff's body or face. *See* Exs. J1-J16.[4]

After the photos were taken, the third officer left, and Soto and Comiskey remained in the interview room with Plaintiff. Tr. 77. According to Johnson, Soto again asked him to sign the Miranda card, Plaintiff responded that he did not want to, and Soto replied that he (Johnson) was not getting a lawyer. Tr. 77. Soto then again punched Plaintiff in the face sending him to the floor and kicked him a couple of times. Tr. 78, 198-99. The assault lasted only a couple of seconds, with Soto stopping on his own. Tr. 78. Soto left the room with Johnson still on the floor and Comiskey remained. Tr. 79. Comiskey then reiterated that Plaintiff should tell Soto what he wanted to know, and when Johnson asked for a lawyer again, Comiskey started choking him, punching him in the stomach and screaming at him that he needed to talk and sign the Miranda card. Tr. 79-80; *see* Tr. 198-201. This lasted one or two minutes and then Comiskey left. Tr. 80.

Further according to Johnson, Detective McQuaid then entered the room, smacked Plaintiff and exited. Tr. 81, 215. After which, Johnson was left alone for several hours until Soto and Comiskey re-entered. Tr. 82. Upon returning the detectives advised Johnson that they picked up Dartanion, with whom Plaintiff testified he is close, and who they were beating up in the next room. Tr. 82, 217-18.

---

[4] There was some evidence read into the record about defense counsel at the subsequent arraignment saying that Plaintiff appears to have injured his shoulder/arm and there was a mark on his eye and the prosecution disagreeing. Tr. 102-03.

6

McQuaid then entered and said the same thing. Tr. 83; *see* Tr. 336 (McQuaid and another detective arrested Plaintiff's brother). The threats continued and Johnson asked to speak with his brother. Tr. 83-84, *see* Tr. 116. Plaintiff was then taken to Dartanion. Tr. 84-85, 218, 221, 443. When Johnson entered the room, his brother was crying and had marks all over him. Tr. 85; *see* Tr. 443, 546. McQuaid denied inflicting any type of physical abuse on Dartanion and denied seeing anyone else strike Plaintiff's brother. *See* Tr. 337, 344. In any event, Plaintiff hugged his brother, kissed him on the forehead, and told him everything was going to be okay. Tr. 85, 221, 346, 550. Then, according to Johnson, he turned to Soto, cursed him out and said he wanted a lawyer, to which Soto responded by punching Plaintiff in the back of his head. Tr. 85. Johnson fell to the floor and Soto dragged him out of the room back to the original interview room. Tr. 86.

At this point Plaintiff said he would cooperate. Tr. 86. At Johnson's request, Soto and Comiskey took him out to the loading dock to smoke a cigarette. Tr. 86-87, 223, 444, 498-99, 551. The loading dock is not secluded. It's used by employees to enter and exit the building as well as for deliveries, and it has an entrance for people with disabilities. Tr. 444 & Exs. MM1, MM5, MM11 & MM23. Then, according to Johnson, on the loading dock Plaintiff started screaming at Soto that he would not speak to them, and he wanted a lawyer. Tr. 87. Soto then grabbed Johnson and pinned him against the wall and told Plaintiff he was going to talk and Johnson agreed. Tr. 88. Afterwards, Johnson was put back in the interview room and the detectives left. Tr. 90.

7

Not long after that, Soto and Comiskey took Plaintiff in a car to a location where evidence may have been. Tr. 90, 225, 349, 552-53. Other officers followed them there. Tr. 90; *see* Tr. 348-49, 350-51 (McQuaid and other detectives went also). Johnson showed them where potential evidence was and was then driven back to police headquarters where he was put back in the interview room. Tr. 91, 242-44, 461, 463-65. He was there for approximately a half-hour. Tr. 242, 463. Several photographs of Johnson were taken while he was outdoors at the location with the evidence. Tr. 242-43, 351-52, 464-65 & Exs. I1–I4. The Court notes that in two of these four photos Plaintiff's face is clearly visibly and there are no injuries depicted. *See* Exs. I2 & I4. Soto and Comiskey then entered and said that they wanted Plaintiff to give a statement. Tr. 91; *see* Tr. 466. According to Johnson, he (Plaintiff) then gave them a statement, during which Soto said that Plaintiff is lying, screamed obscenities, and punched and kicked him again and left the room, while Comiskey, who was taking notes, remained. Tr. 92-93; *see* Tr. 466, 469 & Ex. E (written statement given). Comiskey then smacked Johnson, accused him of lying and told Plaintiff to tell Soto what he wanted to know. Tr. 93. Comiskey then left the room. Tr. 93.

Both detectives returned sometime later and told Johnson that they wanted him to sign some statements. Tr. 94. According to Plaintiff, when he replied that he did not want to sign the statements, and then asked to read them, Soto smacked him in the head more than once. Tr. 94-95. Then when Johnson attempted to sign the statements in a sloppy fashion, Soto hit him again and told him to do it more neatly.

8

Tr. 95-96. The detectives then left the room. Tr. 97. Eventually Plaintiff signed a statement detailing what he did. Tr. 232, 246. According to Johnson, he was forced to sign it. Tr. 232.

Plaintiff was then taken to the local precinct and to court the next day. Tr. 97-99. After the arraignment Johnson was transported to Riverhead Correctional Facility ("Riverhead") where he was photographed, booked and taken to medical. Tr. 109-13 & Ex. K & L2 (a blowup of K). Although Plaintiff testified that the photos depict bruising and a cut, *see* Tr. 113, the Court notes that the jury could have reasonably concluded that neither of these pictures show any injuries to Plaintiff's face and they essentially show Johnson in the same condition during the events at issue. *See* Exs. J1-J16 & I1-I4. The Court also notes, that in addition to admitting that he was dishonest during his initial interaction with Suffolk County police officers on April 6, 2010, he was also dishonest during his interactions with Detectives Soto and Comiskey. Tr. 230. Moreover, although Plaintiff contends that he had a scar over his right eye as the result of being assaulted by Defendants, he concedes that the photo of him being taken upon admission to Riverhead after his arraignment shows no scrape, cut or bleeding. Tr. 236-37.

Finally, the Court notes that Defendants deny using any physical force on Plaintiff at any time, and that Johnson never indicated that he did not want to speak with them. *See* Tr. 390, 444, 453, 462, 473, 487, 492, 494, 550, 557. According to Defendants, Plaintiff never indicated that he did not want to sign a statement. Tr. 522-23, 528.

9

### B.      Plaintiff's Motion

Plaintiff now moves for a new trial arguing that the admission at trial of certain "testimonial and documentary evidence related to the murder investigation and Plaintiff's conviction for murder in violation of the Court's own motion *in limine* rulings . . . constitute[d] prejudicial error." Memorandum of Law in Support of Motion for a New Trial ("Pl. Mem."), DE [167-1] at 1.  During oral argument on the various motions *in limine*, the Court ruled that the fact of Plaintiff committing or confessing to the murder that led to the investigation and interrogation by Defendants was precluded. *See* Oral Argument Tr. Jan 7, 2025, DE [167-2], Ex. A at 59, 64-65.

The essence of Johnson's motion is that despite the Court ruling on motions *in limine* that evidence concerning his murder conviction was precluded, several pieces of evidence "directly related to the murder" were nevertheless inappropriately admitted, the totality of which was sufficiently prejudicial to warrant a new trial. *See* Pl. Mem. at 2-3, 4, 7.  Specifically, the Court admitted certain written statements by Plaintiff, handwritten by Defendants, which Johnson then signed. *See* Exs. E, PP, RR.  These exhibits and related testimony concern a woman getting into his car on the day in question. *See* Pl. Mem. at 4.  Exhibit QQ contains directions to a location that Plaintiff took Defendants to as part of their investigation, again handwritten by Defendants and signed by Johnson. *See* Ex. QQ.  Other purportedly prejudicial testimony was admitted concerning Johnson taking Defendants to a wooded area near his home to show Defendants where potential evidence was located, a buccal swab exemplar, *see* Ex. V-4, and finally, that during their testimony concerning their

10

career background, including various promotions Defendants obtained, that they had been promoted to homicide detectives. Pl. Mem. at 4-5. When the admission of this evidence is considered against the totality of the trial evidence, it becomes clear that a new trial would be inappropriate. Therefore, and for the reasons set forth below, the motion is denied.

## II.     DISCUSSION

### A.     Legal Standard

Federal Rule of Civil Procedure 59 provides for a new trial where there are "substantial errors" in the admission of evidence that cause the jury to reach a "seriously erroneous" verdict resulting in a "miscarriage of justice." *Stampf v. Long Island R.R. Co.*, 761 F.3d 192, 202 (2d Cir. 2014) (internal citations omitted); *Graham v. City of New York*, 128 F. Supp. 3d 681, 704-05 (E.D.N.Y. 2021). The motion should be granted where the jury's verdict is "egregious." *DLC Mgt. Corp. v. Town of New Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998). A new trial should be denied where there is only harmless error. *See* Fed. R. Civ. P. 61. Harmless error occurs where the evidence at issue is unimportant relative to the rest of the evidence the jury considered. *See Hynes v. Coughlin*, 79 F.3d 285, 291 (2d Cir. 1996).

### B.     Analysis

#### 1.     *The evidence at issue was not admitted in error*

Initially, the Court rejects Plaintiff's argument that the evidence at issue was admitted in error. The main thrust of Johnson's position is that the erroneously

11

admitted evidence established that he "hired a sex worker and was convicted of murder." Pl. Mem. at 7.  The actual evidence at issue demonstrates otherwise.

In pretrial proceedings, the Court ruled that evidence showing that Plaintiff was convicted of murder was precluded, and it was.  With respect to Exhibits E, PP, QQ, RR and V-4, they were admitted for the limited purpose of allowing Defendants to argue that Plaintiff's signature was sufficiently neat and did not show any sign of the duress he allegedly experienced while in custody.  The Court went to great lengths to make sure that unduly prejudicial material in these documents was redacted before it was presented to the jury. *See* Oral Argument Tr. Jan. 7, 2025, at 64-66; Tr. 41-43 (concluding on that first day of trial that further redactions were appropriate).  Exhibit E is a highly redacted written statement that basically confirms Johnson's movements during sometime at the end of March 2010.  Exhibit PP states only that a few weeks prior to that statement Plaintiff called a woman to meet up with her.  Exhibit QQ is a series of driving directions which supports Defendants' testimony as to what happened during their investigation.  Any related testimony about the location of potential evidence did not address the nature of the crime being investigated and there was no further testimony about who this woman was or what, if any, interaction she had with Johnson.  Exhibit RR confirms that Plaintiff went with Defendants to certain locations and that he met up with a girl.  There is nothing about a murder or sex work in any of these exhibits.  Exhibit V-4 is simply a buccal swab exemplar consent form, which at most demonstrates law enforcement's effort to confirm Plaintiff's identity—it says nothing about the nature

of the crime being investigated and there was no further testimony about it. Exhibit V-4 was admitted simply to allow Defendants to support their testimony concerning the timeline of events. Finally, as to Defendants' testimony concerning their assignments throughout their careers, including to the Major Case Squad of the Homicide Section during the period in question, this testimony was never connected to any other testimony or evidence. In short, no evidence was admitted contrary to the Court's *in limine* ruling concerning Plaintiff's murder conviction, nor was any unduly prejudicial evidence admitted sufficient to warrant a new trial.

> 2. *Even if evidence was erroneously admitted, any error was harmless as the totality of the evidence was sufficient for the jury to return a defense verdict.*

Even if Johnson is correct, and the evidence at issue was improperly admitted, any error was harmless, and so a new trial is unwarranted. There are several pieces of other evidence that are sufficient to support the defense verdict regardless of the evidence at issue. Despite Plaintiff's claims of physical abuse by Defendants, numerous photographs of Johnson were submitted into evidence depicting him throughout the time period when he claims he was subject to excessive force. *See* Exs. J1-J16, I1-I4, K, & L-2. A jury could reasonably conclude that he appears identical in all of them—with no evidence of injury.

Next, during the course of the trial, all sides testified that at some point during Plaintiff's questioning at the Suffolk County police station, his brother Dartanion was brought in for questioning and the two of them spoke. *See* Tr. 85, 221, 346, 550. Accordingly, Dartanion, with whom Johnson testified he was close, presumably could

13

have corroborated some of Plaintiff's version of events, at least whether Johnson appeared injured when they spoke, or that Plaintiff was dragged from the room. Yet Johnson never called his brother to testify. A reasonable jury could have determined that Dartanion's absence was especially glaring because Plaintiff submitted no evidence whatsoever to corroborate any portion of his version of events—no corroborating witnesses or documents of any kind. While this lack of evidence may not have been fatal to his claims, the jury was free to weigh this with all the other evidence submitted.

And though more subtle, but still questionable, was Plaintiff's testimony that he was forced to sign hastily a series of statements against his will, but most of these statements contain edits neatly made and initialed, indicating time taken for a more thorough review. *See, e.g.*, Exs. E (containing several initialed edits), PP (same), QQ (same).

Finally, Johnson admitted that he lied to the police during the course of the investigation. *See* Tr. 230. The jury could have relied on all of this to question Plaintiff's credibility at trial, and conclude that he failed to prove his case.

When the contested evidence is considered in light of all of this other testimony, and Plaintiff's lack of any corroborating evidence, it becomes clear that even if the evidence at issue was admitted in error, any error was harmless. Accordingly, Plaintiff's motion for a new trial is denied.

### III.    CONCLUSION

14

For the reasons above, Plaintiff's motion for a new trial pursuant to Fed. R. Civ. P. 59 is denied.

Dated: Central Islip, New York
January 29, 2026

**SO ORDERED.**

<u>/s/ Steven I. Locke</u>
STEVEN I. LOCKE
United States Magistrate Judge